**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GIOVANNI MUCCI,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.    14-cv-5215** |
| | : | |
| **MICHAEL TAYLOR, et al.,** | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

**SITARSKI, M.J.**                                                    **September 9, 2016**

Currently pending before the Court are two motions for summary judgment filed pursuant to Fed.R.Civ.P. 56(c) on behalf of Defendant Dr. Thorris Green, (ECF No. 89), and Defendant Dr. Ronald Phillips, (ECF No. 90); oppositions to each summary judgment filed by Plaintiff Giovanni Mucci, (ECF Nos. 98, 103); and reply briefs submitted by Defendants Green and Phillips, (ECF Nos. 101, 106).  For the following reasons, summary judgment will be **GRANTED** in favor of Defendants Green and Phillips.

## I.    BACKGROUND[1]

### A.    The Parties

At all times relevant to this litigation, Plaintiff Giovanni Mucci, ("Plaintiff" or "Mucci"), was incarcerated as a pre-trial detainee at the George W. Hill Correctional Facility, ("GWHCF"), (Sec. Amend. Compl. ¶¶6, 42, 73, ECF No. 52), as a result of criminal charges lodged against

---

[1]  The following focuses on those portions of the record relevant to Plaintiff's claims against Drs. Green and Phillips, alleging deliberate indifference to his serious medical needs.

him in Delaware County, Pennsylvania.  Defendant Dr. Ronald Phillips was the Medical Director at GWHCF.  (*Id.* at ¶24).  Defendant Dr. Thorris Green, ("Dr. Green"), a general dentist, provided dental services to inmates at GWHCF, including Mucci.  (*Id.* at ¶25).

### B. Procedural History

Mucci filed this civil rights action on September 10, 2014, *pro se.*  (Complaint, ECF No. 1-1).  In a counseled Second Amended Complaint, Mucci asserted various claims arising out of his September 13, 2012, arrest by members of the Upper Darby Police Department, and the medical treatment provided during his subsequent incarceration at GWHCF.  (Sec. Amend. Compl.).  As against Defendants Dr. Green and Dr. Phillips (collectively referred to as the "Medical Defendants"), Plaintiff asserted a claim for deliberate indifference to his serious medical needs, in violation of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution.[2]  (*Id* at ¶¶71-80).  Specifically, Mucci claimed that the Medical Defendants failed to remove, in a timely fashion, hardware used to stabilize his broken jaw, (*id.* at ¶¶74-76, 80); provided inadequate pain medication; and failed to send him for necessary medical consultations with an orthopedist and an ophthalmologist, despite hospital discharge instructions to do so, (*id.* at ¶¶48, 77).

The parties consented to the exercise of jurisdiction by a United States Magistrate Judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and the matter was referred to this Court on October 20, 2015.  (Consent and Order, ECF No. 71).  Discovery is closed, dispositive motions are fully briefed, and the matter is now ripe for disposition.

---

[2]  Claims against Community Education Centers, Inc., the private company hired to operate GWHCF, were dismissed.  (Order, ECF No. 64).

### C.      Undisputed Facts

For purposes of summary judgment, the following facts are either undisputed or viewed in the light most favorable to Mucci, the non-moving party.  On September 13, 2012, Mucci was arrested in Upper Darby, PA, following a police pursuit.  It is undisputed that Mucci sustained injuries while being taken into police custody, though the manner in which he was injured is hotly contested.  Upper Darby police officers transported Mucci to the Emergency Room of Delaware County Memorial Hospital.  (Green Statement of Undisputed Facts, ("Green SOF"), ¶1, ECF No. 89[3] 16-19).  Mucci presented with a number of injuries, including a fractured jaw, and aggravation of prior knee and back injuries.  (Phillips Statement of Undisputed Facts, ("Phillips SOF"), ¶1, ECF No. 90-2).

On the following day, September 14, 2012, Mucci was transferred from Delaware County Memorial Hospital to Crozer-Chester Medical Center ("Crozer-Chester") in order to receive treatment for his broken jaw from the Oral and Maxillofacial Surgery ("OMFS") service.  (Green SOF ¶4).  That day, oral and maxillofacial surgeon Dr. Cindy Nguyen placed an arch bar/jaw-wiring in Mucci's jaw to stabilize the diagnosed fracture.  (Green SOF ¶¶5-6).  Plaintiff received hospital discharge instructions that stated, in pertinent part, "[f]ollow up with OMFS in 2 weeks 215-707-3613 to remove hardware."  (Green SOF ¶¶7-9).  The discharge summary also instructed Mucci to follow up with an ophthalmologist in one week, and an orthopedist in a week or two for right knee and back pain.  (Ex. D to Pl.'s Opp'n to Phillips Mot. for Summ. J., ECF No. 103-7).  A right knee brace was issued, and a soft diet recommended.  The discharge instructions indicated "Motrin for pain, Amoxicillin for one week …continue on soft diet . . . use

---

[3]  Plaintiff filed a Counter-Statement of Material Facts to Dr. Green's Statement of Facts, (ECF No. 98-3), and a Counter-Statement of Material Facts to Dr. Phillips' Statement of Facts, (ECF No. 103-1).  Unless otherwise noted, the facts set forth here are not disputed by Plaintiff.

[right] knee brace . . . " (Ex. K to Pl.'s Opp'n to Phillips Mot. for Summ. J., ECF No. 103-14). Mucci's discharge summary from Crozer-Chester was not part of his GWHCF medical file. (Ex. M to Green Mot. for Summ. J. ¶4, ECF No. 89-14).

Plaintiff transferred from Crozer-Chester to GWHCF on or about September 17, 2012. (Green SOF ¶7; Phillips SOF ¶2). GWHCF medical staff (other than Drs. Phillips and Green) saw Mucci upon entry to the facility; again on September 21; twice on September 22; and September 23, 2012.[4] (Ex. H to Phillips Mot. for Summ. J. 2, ECF No. 90-6,). Progress notes reflected a "detox protocol" for Mucci, who was in "no urgent distress." (*Id.*) Medical Department Daily Segregation Evaluation Rounds Notes reflect that GWHCF medical staff checked on Mucci almost daily from September 22 through October 10, 2012. (*Id.* 8-9). Staff reported that Mucci appeared "normal" and "appropriate" at each rounds visit. (*Id.*).

Dr. Phillips first examined Mucci on September 28, 2012, and noted that Mucci was to remain on a soft mechanical diet. (Ex. H 3, ECF No. 90-6). Dr. Green first examined Mucci on October 3, 2012, for evaluation of his arch bar and the wiring in his mouth.[5] (Green SOF ¶¶10-12). At that visit, Dr. Green ordered x-rays, which were taken on October 4, 2012, and on October 11, 2012. Dr. Green further noted that Mucci would be referred to an off-site oral

---

[4] We consider all the medical documentation submitted by the parties. However, the medical records in evidence are not complete and in some instances, illegible.

[5] It is undisputed that Mucci saw Dr. Green on October 3, 2012. However, Mucci suggests that he also saw Dr. Green on September 28, 2012, based on a document titled "Physician's Orders." (Ex. C to Pl.'s Opp'n to Green's Mot. for Summ. J. ECF No. 98-6). That document shows a crossed out stamp for "Thorris J. Green D.D.S." Dr. Green contends that cross-out denotes that he did not see Mucci on that date, and other documents in the record show Mucci was out for Court on that date. Even assuming Dr. Green saw Mucci on September 28, and October 3, 2012, such a discrepancy would not "affect the outcome of the suit under [Section 1983]," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and therefore, is not considered a material fact for summary judgment purposes.

surgeon for removal of the jaw hardware. (Green SOF ¶¶13,15; Phillips SOF ¶4; Ex. M ¶6, ECF No. 89-14). Dr. Phillips reviewed the x-rays on October 12, 2012, (Phillips SOF ¶5), and Dr. Green reviewed them on October 24, 2012. (Green SOF ¶16; Phillips SOF ¶5).

On November 10, 2012, Mucci submitted a grievance, requesting removal of his jaw wires. (Phillips SOF ¶6). Dr. Green learned of Mucci's grievance on the evening of November 20, 2012. (Ex. M ¶9 , ECF No. 89-14). The next day, November 21, Dr. Green referred Plaintiff to off-site oral surgeon, Daniel Daly, for removal of the maxillary arch bar. (Green SOF ¶20; Ex. M ¶11, ECF No. 89-14; Phillips SOF ¶8). The arch bar was removed by Dr. Daly on November 27, 2012. (Green SOF ¶21-22; Ex. M ¶11, ECF No. 89-14; Phillips SOF ¶¶9, 13). Removal of Mucci's hardware was accomplished under anesthesia, (Phillips SOF ¶13), and without complication, (Ex. J to Green Mot. Summ. J. ECF No. 89-11). Dr. Daly recommended Motrin for pain following the removal procedure. (Phillips SOF ¶10). On the same day, Dr. Green reviewed Dr. Daly's consultation report and ordered Motrin pursuant to Dr. Daly's recommendation. (Green SOF ¶23; Phillips SOF ¶11). Mucci himself testified that it was a pain-free, complication-free procedure, with no residual complications. (Ex. C to Pl.'s Opp'n to Phillips' Mot. for Summ. J. ECF No. 103-6, hereinafter "Mucci Dep.," at 346-47). Pain and discomfort from the hardware removal resolved in less than two weeks. (*Id.* at 356). Since the removal of the arch bar on November 27, 2012, Mucci has reported no medical or dental issues resulting from his jaw fracture. (*Id*. at 366-367; Phillips SOF ¶14;).

In addition to his jaw fracture, Mucci complained that Dr. Phillips failed to treat his bloodshot, infected right eye.[6] (Mucci Dep. 391-393). As to Mucci's right eye, Crozer-Chester

---

[6]  Mucci does not claim that Dr. Green, a dentist, was deliberately indifferent to his medical needs beyond those that relate to the jaw hardware. (Pl.'s Br., ECF No. 98-2). Therefore, Mucci's other complaints including eye, knee, and back, relate to Dr. Phillips only.

prescribed eye drops when Mucci was discharged on or about September 17.  (Ex. K, ECF No. 103-14).  Dr. Phillips ordered the eye drops ("Prednisolone Acetate to Right Eye four times a day") for Mucci on September 19, 2012.  (Ex. H to Pl.'s Opp'n. to Phillips Mot. for Summ. J. ECF No. 103-11; Mucci Dep. 391-93).  Mucci testified that the bloodshot condition of his right eye resolved several weeks after his September 13, 2012, arrest.  (Mucci Dep. 393).  Thereafter, in a note dictated on April 11, 2013, Dr. Phillips indicated that Mucci presented with "Hx of vague eye symptoms since injury.  Will consult ophthalmologist."  (Ex. Z to Pl.'s Opp'n . to Phillips Mot. for Summ. J., ECF No. 103-28, at 3).  Dr. Phillips subsequently sent Mucci to an off-site ophthalmologist on two occasions for "eye irritation, like a burning" in his eye.  (*Id.* at 391-95).  The ophthalmologist diagnosed Mucci with "dry eye syndrome," and prescribed eye drops.  (*Id.*).  Mucci received the eye drops at GWHFC.  (*Id*. at 394-95).

Finally, Mucci complained that he "was not given the medications prescribed by his discharging physicians.[7]"  (Phillips SOF ¶15; Pl.'s CSOMF ¶15, ECF No. 103-1).  The Crozer-Chester discharge record does not include any medications prescribed for Mucci.  (Ex. D, ECF No. 103-7).  One document ("Trauma Service Discharge Day Management") instructed Mucci to "take Motrin for pain.  Amoxicillin for 1 week due to orbital fracture/nasal fracture.  Eye drops

---

[7]  It is unclear what Mucci means here.  In his opposition to summary judgment, he points the Court – without explanation - to three exhibits.  (Exs. R, T, AA, Pl.'s Opp'n to Phillips' Mot. for Summ. J., ECF Nos. 103-21, 103-22, 103-29).  The first document, ("Trauma Progress Notes"), lists Klonopin, Amoxicillin, Percocet and three illegible medications, but it is not clear who prescribed them or for what time period.  The second document, ("Medication Coordination Booklet Home Medications"), also lists Percocet, Naprocin, and Klonopin under a section entitled "Home Medications" to "resume at discharge."  However, Mucci refused to sign this document, and it is not clear that the medications were prescribed by Crozer-Chester, or by a prior private source, nor is it clear when the medications were prescribed.  Exhibit "AA" is a handwritten, unsworn statement from Mucci with two attached prescriptions for Percocet dated August 30, and September 10, 2012, written by a private physician.  None of the documents referenced by Mucci show a prescription from Crozer-Chester for Percocet or Klonopin, nor do they show that any physician from Crozer-Chester believed that those medications should be given to Mucci at GWHCF.

as instructed. . . . Continue on soft diet until you see OMFS.  Use [right] knee brace until you see ortho doctor. "  (Ex. K, ECF No. 103-14).

GWHCF medical records indicated that on September 18 and September 19, 2012, Dr. Phillips placed orders for Mucci to receive Amoxicillin, Naproxen (Aleve), and Prednisolone Acetate eye drops along with other medications.  (Ex. H, ECF No. 103-11).  Mucci continued to receive pain medication, other than Percocet, throughout his time at GWHCF.  (Mucci Dep. 397-98).  Mucci continued to use the right knee brace provided by Crozer-Chester, and reported being able to "walk and get around" during his time at GWHCF.  (*Id*. at 401).

Mucci submitted thirteen inmate grievance forms between November 5, 2012, and December 30, 2014, complaining of injuries sustained during his September 13, 2012 arrest, and further complaining of chronic, pre-existing injuries, allegedly aggravated during his arrest.  (Ex. B, Pl.'s Opp'n. to Phillips Mot. for Summ. J., ECF No. 103-5).  Notations on the bottom of all but three of the grievance forms show notes from GWHCF staff responding to Mucci's grievances.  (*Compare* Ex. E., Sec. Amend. Compl. with Ex. B, ECF No. 103.5 and Ex. A to Pl.'s Opp'n to Green Mot. for Summ. J. ECF No. 98-4).  Only two grievances refer to Mucci's jaw; one dated November 10, 2012, and the other dated November 5, 2012.  (*Id*.).  Many of the remaining grievances relate to Mucci's disagreement over the type of pain medication provided by GWHCF.  For example, Mucci requested Percocet, complaining that the Motrin and other non-narcotic medications given by GWHCF were "inadequate."  (Ex. E, Sec. Amend. Compl., ECF No. 52-7).

Mucci contends that Drs. Green and Phillips delayed in removing his jaw hardware, and that this delay caused the wires to cut his gums, resulting in severe pain and discomfort, and an unnecessarily prolonged liquid diet.  (Pl.'s Opp'n to Green Mot. for Summ. J. 7).  He further

claims that Dr. Phillips failed to refer him out for orthopedic and ophthalmologic consults or prescribe physical therapy, and prescribed inadequate pain medication.  Mucci alleges that the Medical Defendants acted in contravention of discharge orders from Crozer-Chester, and that their failure to follow the Crozer-Chester discharge instructions amounts to deliberate indifference to his serious medical needs.  (Pl.'s Opp'n to Mots. for Summ. J. ECF Nos. 98, 103).

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party.  *Id.* at 248-29.  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) *(citing U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson,* 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus. v. Local* 825, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.

## III.    DISCUSSION

Plaintiff's inadequate medical treatment claims are brought pursuant to 42 U.S.C. § 1983, which "is not itself a source of substantive rights," but merely provides "a mechanism for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979). Accordingly, the first step in any such claim is to identify the specific constitutional right allegedly infringed.[8] *Id.* at 140. As a pre-trial detainee, Plaintiff properly relies upon the Fourteenth Amendment to the United States Constitution as the basis for his claims of inadequate medical care. (Sec. Amend. Compl. ¶73); *see Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir.

---

[8]   The parties do not dispute that the alleged deprivation was committed or caused by a person acting under color of state law, and therefore, the Court will consider this element satisfied for summary judgment purposes.

2005).  However, courts apply the Eighth Amendment standard to determine whether a pre-trial detainee's Fourteenth Amendment rights were violated.  *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003).

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).  To set forth a cognizable claim against a correctional health care provider, an inmate must establish: (1) a "serious medical need," and (2) actions or omissions that demonstrate a "deliberate indifference" to that need.  *Id.* at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  The first prong requires an inmate to establish that, objectively, his medical need was sufficiently serious.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations and internal quotations omitted).  Under the second prong, he must prove that, subjectively, the prison officials acted with "a sufficiently culpable state of mind."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  Only the "unnecessary and wanton infliction of pain" rises to the level of a constitutional violation.  *Id.* at 297.

### A.      First Prong of *Estelle* Test - Serious Medical Need[9]

A medical need is deemed "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment.  For instance, *Estelle* makes clear that

---

[9]  Contrary to Mucci's assertion, the issue of whether his conditions amounted to serious medical needs has not been waived.  While it is true that Dr. Green did not dispute that Plaintiff's medical needs were "serious," Dr. Phillips certainly did make this argument in his motion for summary judgment.  (Phillips Mot. for Summ. J. ECF No. 104).  In any event, the Court finds that the jaw hardware presents a serious medical need in this case, *infra.*

if "unnecessary and wanton infliction of pain" results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment.  *See Id.* at 103-05.  In addition, where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious. *See Id.* citing  See *e.g., Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir. 1984) (pregnant inmate who miscarried stated cognizable claim where she alleged that defendants intentionally delayed emergency medical aid in order to make her suffer); *Ramos v. Lamm,* 639 F.2d 559, 576 (10th Cir.1980) (delay in providing oral surgery resulted in "continued and unnecessary pain and loss of teeth"), *cert. denied,* 450 U.S. 1041 (1981).

In this case, Mucci has established that he suffered a broken jaw requiring arch bar placement, an injury to his eye, and exacerbation of pre-existing injuries as a result of the events that occurred on September 13, 2012.  The Medical Defendants do not challenge the existence of the injuries identified by Mucci.[10]  However, Dr. Phillips argues that the broken jaw and its alleged effects, including overgrowth of gum tissue, do not constitute a serious medical need.  While a close call, we do not agree.  A fractured jaw and resulting pain have been found to constitute an objectively serious medical need.  *See Tenon v. Dreibelbis,* 606 F. App'x 681, 685

---

[10]   Dr. Phillips argues that Mucci is collaterally estopped from raising claims based on orthopedic and ophthalmologic referrals.  (Phillips' Reply, ECF No. 104-2).  He points to a March 30, 2015, Order issued by the Honorable C. Darnell Jones denying Phillips' Motion to Dismiss.  (Order, ECF No. 48).  We do not agree that Judge Jones' March 30 Order "definitively determined" that Mucci's claim is limited to his broken jaw and alleged denial of pain medication.  In his Second Amended Complaint, Mucci pled that "[d]espite having doctor's orders for the Plaintiff to be seen by an orthopedist and an ophthalmologist, the Defendants failed to organize the transport and make Plaintiff available for the necessary medical appointments."  (Sec. Amend. Compl. ¶77).  There has been no previous ruling dismissing this averment from the case.

(3d Cir. 2015).  We are mindful that, unlike the plaintiff in *Tenon*, Mucci received treatment for his broken jaw at Crozer-Chester prior to his arrival at GWHCF.  However, viewing the evidence in the light most favorable to the non-moving party, we consider the pain attendant to a wired, broken jaw to be objectively serious.[11]

With regard to his other injuries, Dr. Phillips argues that Mucci failed to meet his burden of proof with regard to the seriousness of his eye, back, and knee injuries because Mucci did not provide expert testimony to explain why these injuries are "serious"  We agree.[12]  As pointed out by the Medical Defendants, Mucci has failed to provide an expert medical opinion that establishes the seriousness of his eye, back and knee injuries.  Where the seriousness of injury or illness would be apparent to a lay person - such as a gunshot wound - expert testimony would not be required.  *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d. Cir. 1987).  However, the Third Circuit has held that when laymen would not be in a position to decide whether a condition could be classified as "serious," expert medical opinion is required.  *Id*.  In *Boring*, the Third Circuit considered whether expert testimony was required to support claims of pretrial detainees that their rights were violated by inadequate medical care.  The medical conditions at issue in *Boring* included a pre-existing nerve injury, a scalp condition, a pre-existing knee injury, migraine

---

[11]  Whether the Medical Defendants were deliberately indifferent to Mucci's serious medical need is a separate issue, addressed by the Court, *supra.*

[12]  Additionally, as a threshold matter, Mucci has adduced no evidence that delay or denial of treatment for his back, knee and eye ailments would result in "unnecessary and wanton infliction of pain," *Estelle*, 429 U.S. at 103, or cause a life-long handicap or permanent loss. *Monmouth Cnty. Corr. Inst. Inmates*, id at 105.  To the contrary, Crozer-Chester progress notes indicate that a CT of Mucci's cervical spine and abdomen/pelvis showed "no acute injuries," and that an orthopedic assessment of Mucci's right knee found "no acute injury."  (Ex. F, ECF No. 103-9, Pl.'s Opp'n to Phillips Mot. for Summ. J.).  As for his eye injury, Crozer-Chester discharge notes recommended only eye drops and follow up care.  (Ex. K, ECF No. 103-14). Mucci himself testified that his bloodshot eye from the incident cleared up in a few weeks, his eye infection has been treated with drops, and he was able to walk and get around GWHCF. (Mucci Dep. at 391-394, 401-402).

headaches, and use of temporary rather than permanent dental fillings.  *Id*. at 473.  The *Boring*

court determined that laymen would not be in a position to decide whether these conditions could

be classified as "serious," and required expert medical opinion evidence to establish the

"seriousness" of the conditions at issue.  *Id.*; *see also Williams v. Guard Bryant Fields*, 535 F.

App'x 205, 212 (3d Cir. 2013) (expert medical testimony required to establish seriousness of

broken nose and facial lacerations).

Here, Mucci identifies as his "serious" medical needs a bloodshot, irritated eye, and

exacerbation of pre-existing injuries to his knee, back and neck.  Unlike the gunshot wound

example provided in *Boring*¸ the seriousness of Mucci's back, knee and eye injuries would not

"be apparent to a lay person."  In the absence of competent expert opinion evidence, the jury

would be required to speculate as to whether these ailments rose to the level of seriousness

required by *Estelle*.  *Boring*, 833 F.2d at 473.  As *Boring* makes clear, a layman would not be in

a position to decide the seriousness of Mucci's injuries without expert medical evidence.

Therefore, expert medical evidence is necessary to establish the "serious medical need"

requirement for Mucci's eye injury and exacerbation of his prior orthopedic injuries.

Mucci submits the report of pathologist William Manion, M.D..  As a preliminary matter,

we question whether a pathologist, such as Dr. Manion, possesses the requisite specialized

knowledge regarding Mucci's knee, eye and back conditions.  *See Anderson v. McAfoos*, 57 A.3d

1141 (Pa. 2012).   More importantly, Dr. Manion does not address the "seriousness" of these

ailments.  He offers only a conclusory statement with regard to Mucci's injuries, commenting

that Mucci's "recuperation and treatment was thwarted due to his inability to participate in

follow-up treatment as prescribed by his discharging treatment providers."  (Ex. L, Pl.'s Opp'n.,

ECF No. 103-15).  He generally avers that Plaintiff "could have been killed from this beating,"

*id.,* but does not explain how the eye, back, and knee injuries, if not properly treated, were sufficiently serious to cause death or other lasting injury.  Dr. Manion does not provide the expert evidence necessary to establish the seriousness of Mucci's eye and orthopedic injuries.

In sum, with the exception of his wired jaw, Mucci's injuries do not constitute "serious medical needs."  The conclusory statements of Dr. Manion, without more, are not sufficient to establish a serious medical need.  *Henderson v. City of Philadelphia*, No. 98-3861, 1999 WL 482305, at *22 (E.D. Pa. July 12, 1999), *aff'd sub nom. Estate of Henderson v. City of Philadelphia*, 216 F.3d 1076 (3d Cir. 2000) (expert's conclusory opinion insufficient to prevent summary judgment as the court is not obligated to accept conclusory legal allegations from [a party] or [its] experts); *Oddi v. Ford Motor Co*, 234 F.3d 136, 158 (3d Cir. 2000).  For summary judgment purposes, we accept as  true that Mucci suffered an eye injury on September 13, 2012, and that the events of that day appear to have exacerbated other, pre-existing, injuries.  It is also true that Crozer-Chester recommended follow-up consultations with an orthopedist and ophthalmologist, use of a knee brace, a soft diet, and physical therapy.  However, without competent expert medical evidence as to the seriousness of these aliments, we reject the contention that Mucci's eye issues, and the exacerbation of pre-existing, chronic injuries to his knee, back and neck constitute serious medical needs, as required under the first prong of *Estelle*.[13]

---

[13]  Even assuming for purposes of this motion that Mucci's non-jaw-related injuries met the first prong of *Estelle*, there is no evidence that Dr. Phillips was deliberately indifferent to these complaints.  It is undisputed that Dr. Phillips twice sent Mucci off-site for ophthalmologic examinations which resulted in diagnoses of "dry eye," and a prescription for eye drops and eye glasses.  (Mucci Dep. 391-96).  Medical records also show that, throughout his incarceration, Mucci received pain medications to treat pain associated with his pre-existing, chronic knee and back issues.  (*Id.* at 397-98).  Mucci's desire for more or different treatment by way of an orthopedic consult, additional ophthalmologic care, and different pain medication, such as Percocet, does not amount to deliberate indifference on the part of Dr. Phillips.  *See Spruill v.*

**B.  Second Prong of *Estelle* Test - Deliberate Indifference**

Under the second prong of the *Estelle* test, a prison official acts with deliberate indifference towards a serious medical need when he recklessly disregards "a substantial risk of serious harm."  *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009).  Deliberate indifference requires a subjective culpable state of mind.  *Farmer*, 511 U.S. at 837.  The Third Circuit has held that deliberate indifference may exist where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  *Rouse*, 182 F. 3d. at 197 (collecting cases).  Allegations of medical malpractice are not sufficient to establish an Eighth Amendment violation for inadequate medical care.  *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

---

*Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Paulino v. Burlington County Jail*, 438 Fed.Appx. 106 (3d Cir. 2011) (failure to provide inmate with drug (Percocet) prescribed by private physician does not amount to deliberate indifference); *Gibbons v. Montgomery Cty.,* No. 16-1233, 2016 WL 3878182, at *4 (E.D. Pa. July 18, 2016) (disagreements between an inmate and prison medical personnel about the kind of treatment received generally are not held to violate the Eighth Amendment.).

Crozer-Chester notes recommend continued physical therapy for Mucci, but there is no evidence that Dr. Phillips was aware of this suggestion, as the discharge summary was not part of his GWHCF medical file.  (Ex. M ¶4, ECF No.89-14).  Even assuming Dr. Phillips was aware of the recommended therapy, Mucci has adduced no evidence that Dr. Phillips consciously disregarded a risk by not providing it.  *Estelle*, 429 U.S. at 107 (question of whether "additional . . . forms of treatment [are] indicated is a classic example of a matter for medical judgment.") Similarly, Mucci's belief that his eye condition required additional or different treatment relates to the adequacy of his care; the failure of Dr. Phillips to provide exactly the type of treatment Mucci desired does not amount to deliberate indifference.  *See United States ex rel. Walker v. Fayette County,* 599 F.2d 573, 575 n. 2 (3d Cir.1979) (federal courts generally reluctant to second guess a medical judgment and to constitutionalize claims which sound in state tort law.). Based on the Court's review of the record, no reasonable jury could conclude that Dr. Phillips was deliberately indifferent to Mucci's medical needs related to his eye, or his pre-existing orthopedic injuries.

The deliberate indifference standard affords considerable deference to prison doctors. *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).  Indeed, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993).  Courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment[,] which remains a question of sound professional judgment."  *Inmates of Allegheny Cty. Jail,* 612 F.2d at 762 (internal alterations, quotation marks omitted).  Thus, disagreements between an inmate and prison medical personnel about the kind of treatment received generally fail as constitutional claims, since "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997); *see*, *e.g., Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

Mucci's claim relating to his jaw injury rests on the premise that the Medical Defendants violated his Constitutional rights by failing to follow the Crozer-Chester discharge instructions to the letter.  Specifically, with regard to the jaw hardware, he argues that the Medical Defendants failed to send him for an OMFS follow-up within two weeks.  As a threshold matter, there is no evidence that the Medical Defendants saw the Crozer-Chester discharge instructions, and it is undisputed that the discharge instructions were not part of Mucci's prison medical file.[14]  The Medical Defendants cannot be held liable for failing to follow a recommendation of which they

---

[14]  Mucci also argues that a reasonable jury could find that Dr. Green acted with deliberate indifference by failing to locate and review the Crozer-Chester discharge instructions that directed Mucci to schedule a follow-up appointment with an OMFS in two weeks to schedule removal of the hardware.  (Pl.'s Opp'n. to Green's Mot. for Summ. J., ECF No. 98-2,at 6).  This argument has no merit.  Failure to review or locate the discharge instructions itself amounts to no more than negligence or medical malpractice, which is not actionable in this context.  *See Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d at 346. (mere negligence does not state a claim of cruel and unusual punishment.)

were not aware.  *Farmer*, 511 U.S. at 837-38 (official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.)

Even assuming that the Medical Defendants knew about the Crozer-Chester discharge summary instruction for Mucci to see an oral surgeon in two weeks for hardware removal, the failure of the Medical Defendants to follow that instruction does not necessarily amount to deliberate indifference.  *Estell*e, 429 U.S. at 106.  Deliberate indifference can only be demonstrated if a prison official "knows of and disregards an excessive risk to inmate health and safety."  *Farmer*, 511 U.S. at 837.  Here, Mucci has failed to adduce evidence that the Medical Defendants acted with the culpable state of mind required to establish deliberate indifference. To the contrary, both doctors considered and addressed the arch bar in Mucci's mouth.  Dr. Phillips ordered pain medication (Aleve) and antibiotics (Amoxicillin) for Mucci promptly upon his arrival at GWHCF, which tracks the Crozer-Chester discharge instructions for Mucci to take "Motrin for pain.  Amoxicillin for 1 week."  (Ex. K, ECF No. 103-14).  He also noted that Mucci should follow a soft diet, which is also consistent with the Crozer-Chester discharge instructions. Dr. Phillips reviewed x-rays of Mucci's jaw in early October of 2012.  (Phillips SOF ¶5).  Other than this review, Dr. Phillips played no further role in medical care as it related to Mucci's jaw and hardware.  (Ex. H, ECF No. 90-6; Phillips SOF ¶5).

The evidence shows that Dr. Green evaluated and recommended treatment for Mucci's jaw.  On October 3, 2012, Dr. Green examined the arch bar and the wiring in Mucci's mouth, (Green SOF ¶¶10-12), made a referral to an oral maxillary surgical specialist for the removal of Mucci's hardware, and ordered x-rays, which were performed on October 4, 2012, and October 11, 2012.  (Green SOF ¶15; Phillips SOF ¶4; Ex. G, ECF No. 89-8; Ex. M ¶6, ECF No. 89-14).

Dr. Green reviewed the x-rays on October 24, 2012.  (Green SOF ¶16; Ex. H, ECF No. 89-9; Ex. M ¶8, ECF No. 89-14).

In November 2012, Mucci submitted two grievances related to his jaw.[15]  One grievance, dated November 10, 2012, complained that the wiring in his jaw needed to be removed because it was 'tearing [his] gums up."  (Ex. A 26, ECF No. 90-4).  Mucci claims to have submitted an earlier grievance about his jaw.  That document, dated November 5, 2012, is illegible, and the record is devoid of evidence that any member of the GWHCF medical staff ever actually received this document.[16]  We give Plaintiff the full benefit of the doubt that he filed these two grievances in November.  However, the mere submission of a grievance, without more, is not enough to impose individual liability on the Medical Defendants.  *See Rode v. Dellarciprete*, 845

---

[15]  There is nothing in the record that Mucci complained about his jaw prior to the submission of the November grievances.  Additionally, Mucci has adduced no evidence that either doctor knew that the hardware had not been removed, or was aware of any complaints or grievances about the hardware prior to November 20, 2012.  (Mucci Dep. at 332, 350).  In his opposition to summary judgment, Mucci submitted a document entitled "Suggested Material Facts for Case Against Green and Phillips."  (Ex. A to Pl.'s Opp'n to Phillips Mot. for Summ. J., ECF No. 103-4).  This document is not signed by Mucci, and thus is nothing more than an unsworn statement of questionable evidentiary value.  Even if the Court gives Mucci the benefit of the doubt, and considers the document to be an affidavit in support of Mucci's opposition to summary judgment, it is unavailing under the circumstances of this case.  The statement reports that Mucci told Green and Phillips about the delay in hardware removal and associated pain in his mouth.  However, this document, Plaintiff's self-serving statement, is contradicted by record evidence, and is insufficient to defeat summary judgment.  *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) (conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment); *Hammonds v. Collins*, No. 12-CV-00236, 2016 WL 1621986, at *6 (M.D. Pa. Apr. 20, 2016), *appeal dismissed*, (June 21, 2016) (court not inclined to bar an otherwise proper motion for summary judgment based on self-serving, uncorroborated evidence.).

[16]  The Court is unable to make out the content of the November 5, 2012, grievance slip.  There is no evidence that the grievance was actually submitted to prison staff:  the bottom portion with "date/time received" and "disposition of grievance" appears blank.  However, even assuming the document says what Mucci claims it does – that his wires were to come out "weeks ago" – and that the Medical Defendants received the grievance, delay in Mucci's hardware removal, without more, does not rise to the level of a constitutional violation.

F.2d 1195, 1207 (3d Cir.1988) (for individual liability to attach, plaintiff must establish personal involvement through participation, knowledge, or acquiescence).

Plaintiff has adduced no evidence that the Medical Defendants were deliberately indifferent to the complaints regarding his jaw and gums identified in the November inmate grievance forms. First, as to Dr. Phillips, there is no evidence that Dr. Phillips received a grievance from Mucci, or knew that the jaw hardware needed to be removed, but consciously disregarded the need for the procedure. Medical records contain no reference to Mucci seeing Dr. Phillips between the time of his October 2012, x-rays, and November 27, 2012, the date of the arch bar removal. There is no record evidence that Dr. Phillips was aware of any issues related to Mucci's gums between the time of his September 28, 2012, initial evaluation and the date of the arch bar removal. Mucci has not adduced evidence that Dr. Phillips was aware of, much less deliberately indifferent to, the need for removal of the jaw hardware.

Similarly, Plaintiff has adduced no evidence that Dr. Green was aware of complaints related to Mucci's jaw until November, 20, 2012, when he learned of Mucci's November 10, 2012, grievance. The record evidence establishes that Dr. Green acted immediately upon learning of Mucci's complaint. The day after learning of Mucci's grievance, Dr. Green referred Mucci off-site, to oral surgeon Dr. Daly, for hardware removal. As a result of Dr. Green's referral, the arch bar was removed by Dr. Daly less than a week later, under anesthesia, without complication. [17] (Ex. E 346-47, ECF No. 89-6), (Ex. J, ECF No. 89-11). Dr. Green then prescribed Motrin, the pain medication prescribed by Dr. Daly, on the same day that the removal occurred. Mucci has failed to show that Dr. Green disregarded an excessive risk to Mucci's

---

[17]   Mucci testified that he does not know why it took weeks for the hardware removal to occur. (Mucci Dep. at 332).

health or safety.  *Farmer,* 511 U.S. at 835.  Instead, the evidence shows that Dr. Green acted

promptly to remove Mucci's hardware upon learning of his complaints.

In sum, Plaintiff has adduced no evidence to establish that the Medical Defendants acted,

or failed to act, despite knowledge of a substantial risk of serious harm, as is required under

*Farmer v. Brennan.*  At best, the record suggests that Drs. Green and Phillips negligently failed

to follow up on Plaintiff's medical needs.  "[I]n the medical context, an inadvertent failure to

provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction

of pain' or to be 'repugnant to the conscience of mankind.'"  *Estelle*, 429 U.S. at 405.   It may

not be "cause for commendation" that the Medical Defendants failed to ensure earlier removal of

the arch bar and wiring, but it simply cannot be said that allowing the hardware to remain from

September 17, 2012, until November 27, 2012, amounted to the infliction of punishment in

violation of Plaintiff's constitutional rights.  *Farmer*, 511 U.S. at 838. ("[A]n official's failure to

alleviate a significant risk that he should have perceived but did not, while no cause for

commendation, cannot . . . be condemned as the infliction of punishment.").

Moreover, Plaintiff has pointed to no evidence that Mucci suffered any long-term damage

as a result of the alleged delay in removing the jaw hardware.  At most, he experienced two

weeks of soreness after the procedure, without lasting ill-effects.  The record is devoid of

evidence that would support the conclusion that  Dr. Green and/or Dr. Phillips intentionally

denied, delayed or interfered with Mucci's treatment, or that either one of them unnecessarily

and wantonly inflicted pain on Mucci.  Reviewing all the evidence in the light most favorable to

Mucci as non-moving party, no reasonable jury could find that Dr. Green and Dr. Phillips were deliberately indifferent to the need to remove Mucci's jaw hardware.[18]

## IV.    CONCLUSION

Neither Dr. Green nor Dr. Phillips acted with deliberate indifference to Mucci's medical conditions.  To the contrary, the Medical Defendants took action to address the medical needs of Mucci upon his arrival as an inmate at GWHCF.  Plaintiff's allegations are, at best, claims of medical negligence.  Claims of medical malpractice do not give support Constitutional claims, and an inmate's desire for more, or different, medical treatment is insufficient to establish deliberate indifference.  Mucci's claims against the Medical Defendants fail as a matter of law. Accordingly, summary judgment will be granted in favor of Dr. Green and Dr. Phillips.

BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

---

[18]   To the extent Mucci again relies upon the report of William Manion, M.D., this reliance is misplaced.  Manion is a pathologist with no experience or qualifications as a dentist or oral maxillofacial surgeon.  Therefore, it is not certain that he can provide testimony with regard to the appropriate time and method for removal of hardware for a broken jaw.  *Ferris v. Pa. Fed'n Bd. of Maint. of Way Employees*, 153 F.Supp.2d 736, 743 (E.D.Pa.2001) ("expert's testimony is not limited to the area in which he or she ... specialize[s]," but "the party offering the expert must demonstrate that the expert has the necessary expertise to provide reliable evidence.").  Moreover, Manion presents only a vague, conclusory statement that "failure to remove the wire in [Mucci's] mouth in a timely fashion resulted in his gums growing over the wire causing additional pain and discomfort . . . it was improper for the wire to remain in jaw [sic] for any period of time longer than the scheduled removal date."  (Ex. Ex. L, ECF No. 103-15).  Manion does not identify a "scheduled removal date" nor does he define a "timely fashion." Perhaps most importantly, Manion's conclusory opinion that Mucci suffered pain upon hardware removal is contradicted by Plaintiff's testimony.  Mucci testified that he was placed under anesthesia during the removal, (Mucci Dep. 346-47), that he developed no additional issues as a result of his jaw fracture, (*id*. at 366-67), and that any pain from the removal resolved within two weeks, (*id*. at 355-56).